# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| RANDY and KAREN O'BURKE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. _____ |
| v. ) | |
| ) | JURY DEMAND |
| HENDERSONVILLE HOSPITAL ) | |
| CORPORATION d/b/a TRISTAR ) | |
| HENDERSONVILLE MEDICAL CENTER, ) | |
| MICHAEL JAMES NOTO, M.D., ) | |
| JAYESH A. PATEL, M.D., and ) | |
| CLYDE O. SOUTHWELL, M.D., ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

## INTRODUCTION

Randy O'Burke was a healthy, 49-year-old man when he came down with a host of troubling symptoms, including persistent shortness of breath and nausea. He sought urgent medical care at the nearest emergency room, located at TriStar Hendersonville Medical Center. It was a decision that almost cost him his life.

Mr. O'Burke didn't—and couldn't—know that TriStar Hendersonville encourages physicians not to transfer patients outside the TriStar network, leading them to resist transferring patients to a higher level of care, even when it is medically necessary. So, when Mr. O'Burke's internal organs began shutting down and the physicians at TriStar Hendersonville couldn't figure out what was causing his body to fail, they repeatedly declined Mr. O'Burke's requests for a transfer to Vanderbilt University Medical Center ("Vanderbilt"). Hospital officials even claimed that they had contacted Vanderbilt and learned it didn't have bed space for him—a claim that was

1

proven false when Vanderbilt said it had no records of any transfer request.

After 48 hours of worsening symptoms, a doctor at TriStar Hendersonville told Mr. O'Burke's family that there was nothing more they could do, and death was likely. Only after the chief of Vanderbilt's trauma and surgical critical care division personally intervened did Mr. O'Burke get transferred to a higher level of care at Vanderbilt—a transfer that would eventually save his life after two more weeks in intensive care. Nonetheless, as a result of Defendants' negligent, reckless, and fraudulent delay in transferring Mr. O'Burke to life-saving care, he is permanently injured and disabled for life—no longer able to run his business, care for himself, or provide for his family.

## PARTIES, VENUE, AND JURISDICTION

1. The Plaintiffs, Randy O'Burke and Karen O'Burke ("the O'Burkes") are married adult citizens and residents of the State of California.

2. Defendant Hendersonville Hospital Corporation d/b/a TriStar Hendersonville Medical Center ("TriStar Hendersonville"), is a Tennessee for-profit corporation holding a health care facility license from the Tennessee Department of Health. TriStar Hendersonville is a "health care provider," as that term is defined by Tenn. Code Ann. §29-26-101(a)(2)(B). Its parent company is HCA Healthcare.

3. TriStar Hendersonville's principal place of business is 355 New Shackle Island Rd., Hendersonville, TN 37075.

4. TriStar Hendersonville may be served through its registered agent, CT Corporation System, 300 Montvue Rd., Knoxville, TN 37919-5546.

5. Defendants Michael James Noto, M.D. ("Dr. Noto"), Jayesh A. Patel, M.D. ("Dr. Patel"), and Clyde O. Southwell ("Dr. Southwell") are all medical doctors. Each holds a medical

2

license issued by the Tennessee Board of Medical Examiners. Drs. Noto, Patel, and Southwell are all "health care providers," as that term is defined by Tenn. Code Ann. §29-26-101(a)(2)(A), and, upon information and belief, citizens and residents of Tennessee.

6. The Court has subject matter jurisdiction over this action because Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Additionally, the Court has subject matter jurisdiction over this action because it includes a cause of action that arises under federal law. 28 U.S.C. § 1331.

7. The Court has personal jurisdiction over all Defendants because each Defendant is a citizen and resident of Tennessee, and, in the case of TriStar Hendersonville, its principal place of business is in Tennessee, where it regularly transacts business and maintains an agent for service of process.

8. Venue is proper in the Middle District of Tennessee because a substantial part of the events giving rise to this lawsuit occurred in this district, and all defendants reside here.

## **LEGAL RELATIONSHIPS**

9. Between August 30 and September 2, 2018, Plaintiff Randy O'Burke ("Mr. O'Burke") had a doctor-patient relationship with TriStar Hendersonville.

10. Between August 30 and September 2, 2018, Mr. O'Burke had a doctor-patient relationship with each of Dr. Noto, Dr. Patel, and Dr. Southwell for some or all of the time period.

11. Between August 30 and September 2, 2018, Dr. Noto, Dr. Patel, and Dr. Southwell were agents of TriStar Hendersonville.

12. Between August 30 and September 2, 2018, all nurses, technicians, orderlies, administrators, and TriStar Hendersonville employees or contractors who interacted with the O'Burkes at TriStar Hendersonville were agents of TriStar Hendersonville.

13. Between August 30 and September 2, 2018, Dr. Noto, Dr. Patel, and Dr. Southwell were all persons selected by TriStar Hendersonville to be involved in providing care and treatment to Mr. O'Burke.

14. All of the health care providers who provided care and treatment to Mr. O'Burke at TriStar Hendersonville in August and September 2018 were employees or agents of TriStar Hendersonville.

15. All of the health care providers who provided care and treatment to Mr. O'Burke at TriStar Hendersonville in August and September 2018 were selected or staffed by TriStar Hendersonville to be involved in Mr. O'Burke's care and treatment.

## STATEMENT OF FACTS AND ALLEGATIONS

### A. TriStar Hendersonville's Resistance to Patient Transfers

16. HCA, its TriStar Division, and TriStar Hendersonville are concerned about preventing "out-migration," wherein a patient receiving treatment at an HCA-owned facility is referred to a non-HCA-owned facility for further treatment.

17. In the healthcare industry, patient out-migration is also known as "leakage."

18. TriStar Hendersonville encourages physicians not to "lose" patients by letting them exit the TriStar network for further treatment.

19. TriStar Hendersonville monitors and tracks out-migration and pressures physicians and employees to keep out-migration levels below certain thresholds.

### B. Mr. O'Burke Becomes Ill and Visits TriStar Hendersonville

20. In August 2018, Mr. O'Burke was a healthy, 49-year-old man with no significant medical history requiring emergency care.

21. On or about August 27, 2018, Mr. O'Burke began feeling mildly ill, with modest shortness of breath and gastrointestinal symptoms.

22. On or about August 28, 2018, Mr. and Mrs. O'Burke flew from California to Tennessee to visit Mrs. O'Burke's adult son, Christopher Hieber, who lived in Hendersonville, Tennessee.

23. On or about August 29, 2018, Mr. O'Burke's discomfort intensified, and he experienced nausea, vomiting, and shortness of breath.

24. By the afternoon of August 30, 2018, Mr. O'Burke's shortness of breath was worsening, so he sought emergency medical care. He and his wife went to the emergency room at TriStar Hendersonville, the hospital that was closest to his son's home.

25. Once Mr. O'Burke arrived at the emergency room, he was given breathing assistance and diagnosed with respiratory failure and multi-organ failure based on the constellation of troubling symptoms he displayed. He was admitted to the critical care unit. His stepson Mr. Hieber joined Mr. and Mrs. O'Burke at TriStar Hendersonville.

26. While Mr. O'Burke was being admitted to the critical care unit on the night of August 30, 2019, an on-duty nurse told his family that Mr. O'Burke should transfer to Vanderbilt or TriStar Centennial Medical Center, which were better equipped to provide the critical care Mr. O'Burke required. She warned the family that the physicians at TriStar Hendersonville would resist efforts to transfer him out of TriStar Hendersonville.

**C. Mr. O'Burke Declines Toward Death as Defendants Refuse to Transfer Him**

27. By the early hours of August 31, 2018, it was apparent that multiple of Mr. O'Burke's organs were continuing to fail. He had heartbeat abnormalities (atrial fibrillation), hypoxia that was progressing toward congestive heart failure, renal insufficiency that was

progressing toward kidney failure, liver problems that were progressing toward liver failure, and septic shock.

28. The physicians at TriStar Hendersonville, including Drs. Noto, Southwell, and Patel, could not determine what was causing Mr. O'Burke's organ systems to shut down. They knew he was critically ill, and Dr. Southwell noted that his family was told that he "may get worse" before improving.

29. Given the severity of the unfolding medical situation—and given the nurse's comment the previous night—Mr. and Mrs. O'Burke and Mr. Hieber decided that Mr. O'Burke should be transferred to Vanderbilt for care.

30. On the morning of August 31, 2018, they asked attending physician Marshall Johnson whether TriStar Hendersonville could transfer Mr. O'Burke to Vanderbilt. Dr. Johnson responded that there was no time to transfer Mr. O'Burke because he urgently needed to receive dialysis for his failing kidneys. Dr. Johnson told the family that physicians at TriStar Hendersonville would perform further medical interventions and that if these didn't work, they could contact Vanderbilt. Dr. Patel, too, told the family that Mr. O'Burke could not be transferred.

31. Mr. O'Burke was not put on dialysis until approximately five hours later.

32. By the afternoon of August 31, 2018, the physicians at TriStar Hendersonville—still unsure what was causing Mr. O'Burke's organs to fail—decided he should be intubated and placed on a ventilator. He was put into an induced coma. A port was placed in his neck. A central line was placed in his right jugular.

33. By the morning of September 1, 2018, Mr. O'Burke had experienced blood clotting throughout his body, which disrupted the dialysis. Eventually, the dialysis machine was turned off. For a time, Mr. O'Burke bled profusely, spraying blood from his right jugular.

34. Dr. Noto, a Vanderbilt faculty member, took over Mr. O'Burke's care early on September 1, 2018. He, too, could not determine the cause of the illness that was causing Mr. O'Burke's body to shut down.

35. On the morning of September 1, 2018, Mr. Hieber asked Dr. Noto about transferring Mr. O'Burke to a higher level of care at Vanderbilt, but Dr. Noto said a transfer would be futile.

36. On the afternoon of September 1, 2018, Dr. Noto told Mrs. O'Burke and Mr. Hieber that there was nothing else that could be done for Mr. O'Burke, and that there was a high risk that he would die. He said, "This is what I do for a living, and I'm ashamed that I can't figure it out. There's nothing more I can do for your father." Dr. Noto told them that they should have already summoned out-of-town family members to Mr. O'Burke's bedside to say goodbye in case he did not survive.

37. At that time, Mr. Hieber again asked about transferring Mr. O'Burke to a higher level of care at Vanderbilt. Dr. Noto declined, saying, "You know I'm from Vanderbilt, right? There's nothing they can do for him there that we can't do for him here."

**D. Intervention by Vanderbilt Doctors Forces O'Burke's Transfer**

38. At 6:53 p.m. on September 1, 2018, Mr. Hieber spoke by phone with a friend, Dr. Rick Miller, the chief of trauma and surgical critical care at Vanderbilt. Dr. Miller agreed that transfer seemed necessary and coached Mr. Hieber on what to say in order to request the transfer from TriStar Hendersonville to Vanderbilt.

39. A woman at TriStar Hendersonville who appeared to be in charge of the critical care unit told Mrs. O'Burke and Mr. Hieber that TriStar Hendersonville had checked with Vanderbilt and that Vanderbilt did not have a bed available for Mr. O'Burke.

7

Case 3:19-cv-01167   Document 1   Filed 12/29/19   Page 7 of 18 PageID #: 111

40. In an effort to find out what was going on, Dr. Miller contacted the Vanderbilt Access Center—which processes and logs all inbound transfer requests—himself. He learned that TriStar Hendersonville had not contacted the Access Center about transferring Mr. O'Burke to Vanderbilt.

41. Dr. Miller called Mr. Hieber and said, "They are lying to you."

42. Mr. Hieber confronted TriStar Hendersonville officials about their deception. He told them that the chief of the trauma and surgical critical care division at Vanderbilt had personally confirmed that Vanderbilt's Access Center had not been contacted about a transfer for Mr. O'Burke.

43. A female TriStar Hendersonville administrator whose name is known to TriStar Hendersonville but not to Plaintiffs talked with Mr. Hieber and Mrs. O'Burke. This administrator produced a scrap of paper that purported to demonstrate that someone at TriStar Hendersonville had contacted Vanderbilt about transferring Mr. O'Burke. The administrator went back upstairs.

44. TriStar Hendersonville still refused to transfer Mr. O'Burke to Vanderbilt.

45. Finally, at 8:01 p.m., Dr. Miller had a Vanderbilt Access Center manager contact Mr. Hieber directly. Mr. Hieber handed the phone to a nearby nurse, who confirmed with the Access Center manager that Vanderbilt would accept Mr. O'Burke as a patient.

46. A nurse's note corroborates this account. It says: "SON TALKED TO NURSE EMILY REGARDING THEIR PREVIOUS QUESTION ABOUT TRANSFERRING PATIENT TO VANDERBILT. SON SAID THAT HE CALLED A FAMILY FRIEND AT VANDERBILT AND WAS TOLD THAT THERE WAS [sic] NO INQUIRIES ABOUT BED OPENINGS. HOUSE SUPV. WAS CALLED WHO CALLED TRANSFER CENTER AND THEN

RELAYED INFORMATION TO SON. SON AND WIFE WANTED PATIENT MOVED TO VANDERVILT [sic] FOR HIGHER LEVEL OF CARE. TRANSFER IS NOW IN PROGRESS.

47. Despite the fact that TriStar Hendersonville had finally agreed to transfer Mr. O'Burke to Vanderbilt at approximately 8 p.m. on September 1, 2018—approximately 36 hours after his family's initial request for him to be transferred there—he was not loaded into an ambulance at TriStar Hendersonville until approximately 1:30 a.m. on September 2, 2018. TriStar Hendersonville physicians stopped providing care for the unconscious Mr. O'Burke before that time, and its records reflect that Mr. O'Burke was discharged at 12:10 a.m., 1 hour and 20 minutes before he was transported to Vanderbilt. His condition at discharge was recorded as "guarded."

48. A medical record written by a TriStar Hendersonville physician stated that Mr. O'Burke was transmitted to Vanderbilt for a "higher level of care."

### E. Mr. O'Burke Survives But Faces Lifelong Health Problems Due to Delayed Transfer

49. Despite the fact that physicians at TriStar Hendersonville said nothing further could be done for Mr. O'Burke, who was likely to die, and that nothing could be done for him at Vanderbilt that could not be done at TriStar Hendersonville, Mr. O'Burke did not die after being admitted to Vanderbilt.

50. Physicians at Vanderbilt asked the family why Mr. O'Burke wasn't transferred sooner. Physicians at Vanderbilt said no trauma center in the United States, including theirs, would turn away a patient in Mr. O'Burke's condition. Physicians at Vanderbilt questioned why Mr. O'Burke was placed into an induced coma, which can cause long-term cognitive problems.

51. He remained in intensive care at Vanderbilt for two weeks, but his life was saved.

52. As a result of Defendants' delay in transferring Mr. O'Burke to a higher level of care, their failure to honor his family's repeated requests to transfer him to a higher level of care,

their misrepresentations about contacting Vanderbilt and about bed availability at Vanderbilt, and the other treatment decisions they made, including the decision to place Mr. O'Burke in an induced coma, he experiences a host of physical and mental conditions to this day, including chronic heart failure that may necessitate a heart transplant, significant cognitive impairments, memory problems, speech difficulties, and physical limitations. He is no longer able to work and run his own business, or earn a living to support his family. He is no longer able to fulfill household and marital responsibilities. He suffers from depression, fatigue, post-traumatic stress disorder, and other mental health issues.

53. Mrs. O'Burke has been forced to take over many of Mr. O'Burke's responsibilities related to the business and the household, and has suffered a loss of her husband's companionship, services, and consortium.

54. The O'Burke family has suffered significant financial losses and additional hardships as a result of Defendants' actions and inactions described above.

**COMPLIANCE WITH STATUTORY NOTICE AND GOOD FAITH REQUIREMENTS**

55. Plaintiffs, through counsel, complied with the provisions of Tenn. Code Ann. §29-26-121 requiring individuals asserting a potential health care liability claim to give written notice of such potential claim to each health care provider that will be a named Defendant at least 60 days prior to filing a complaint ("Pre-Suit Notice" or "Notice").

56. On or by August 30, 2019, Notice was given to the Defendants in accordance with Tenn. Code Ann. § 29-26-121.

57. The Affidavit of John Spragens and supporting documentation demonstrating compliance with regard to Notice are attached to this Complaint as **Exhibit 1**.

58. The Complaint was filed more than 60 days after August 30, 2019.

59. The Complaint was filed more than 60 days after Plaintiffs sent Pre-Suit Notice.

60. Defendants had the opportunity to review the facts of this matter between the time of their receipt of Pre-Suit Notice and the filing of this Complaint.

61. Neither Defendants nor any agent acting on a Defendant's behalf, ever communicated to counsel for Plaintiffs any inability or problem with obtaining or reviewing the pertinent medical records, which counsel for the Plaintiff provided directly or provided access to via an appropriate, HIPAA-compliant release for the Defendants to use to obtain records.

62. In accordance with Tenn. Code Ann. §29-26-122, Plaintiffs' counsel has consulted with one or more experts who provided a signed written statement confirming that upon information and belief they are competent under Tenn. Code Ann. §29-26-115 to express opinions in this case and believe, based on the information available from medical records concerning the care and treatment of Mr. O'Burke, that there is a good faith basis to maintain this action consistent with the requirements of Tenn. Code Ann. §29-26-115 ("good faith requirement"). The Certificate of Good Faith demonstrating compliance with the good faith requirement is attached to this Complaint as **Exhibit 2**.

## CAUSATION AND DAMAGES

63. Mr. and Mrs. O'Burke incorporate the allegations set forth above as if fully described herein.

64. As a direct and proximate result of the negligence of the Defendants and their agents and employees, Mr. and Mrs. O'Burke suffered injuries they would not have otherwise incurred.

65. This lawsuit seeks all compensatory damages available in Tennessee, including economic damages and non-economic damages. These requested damages include, but are not

limited to, medical expenses, lost earnings, lost earning capacity, physical pain and suffering, and emotional pain and suffering.

66. This lawsuit seeks punitive damages for the acts described herein involving a conscious disregard for the known risk of harm posed to Mr. O'Burke, which constitutes reckless conduct, and for the acts herein involving intentional, deceptive, and fraudulent conduct.

67. Defendants are not protected by any statutory cap on punitive damages because Tennessee's statutory cap on punitive damages is unconstitutional, including as held by the United States Court of Appeals for the Sixth Circuit in 2018 and Tennessee courts, including the Williamson County Circuit Court in 2019.

68. Alternatively, Tenn. Code Ann. §29-39-102 is unconstitutional because it violates the right to a trial by jury enshrined in both the United States Constitution and the Tennessee Constitution.

**FIRST CAUSE OF ACTION**
**TENNESSEE HEALTH CARE LIABILITY ACT**
**(Tenn. Code Ann. §§ 29-26-101 *et seq.*)**

69. The O'Burkes incorporate the allegations set forth above as if fully described herein.

70. The relationship of health care provider-patient existed between Mr. O'Burke, TriStar Hendersonville, and the health care providers that provided care to Mr. O'Burke during his hospitalization at TriStar Hendersonville, specifically including Dr. Noto, Dr. Patel, and Dr. Southwell and the other health care providers that participated in the care described above.

71. TriStar Hendersonville and its agents and employees, specifically including Dr. Noto, Dr. Patel, and Dr. Southwell, owed Mr. O'Burke a duty to provide appropriate care and

treatment, and to communicate honestly with him and his medical decision-makers about his medical care, during his hospitalization in August and September 2018.

72. TriStar Hendersonville and its agents and employees, specifically including Dr. Noto, Dr. Patel, and Dr. Southwell, failed to comply with the applicable recognized standard of acceptable professional practice ("standard of care") when they provided care and treatment to Mr. O'Burke during his hospitalization in August and September 2018.

73. The ways in which TriStar Hendersonville and its agents and employees, specifically including Dr. Noto, Dr. Patel, and Dr. Southwell, failed to comply with the applicable standard of care includes, but is not limited to:

- a. failing to disclose to Mr. O'Burke and his family that TriStar Hendersonville pressures doctors to minimize out-migration, and that this pressure negatively impacts patient care;
- b. failing to timely transfer Mr. O'Burke to a higher level of care when medically indicated;
- c. failing to timely transfer Mr. O'Burke to a higher level of care when requested by Mr. O'Burke and/or his medical decision-makers;
- d. failing to provide complete and accurate information, and document all communications, regarding patient transfers;
- e. failing to communicate truthfully with Mr. O'Burke and his family about Defendants' actions and inactions relating to his medical care;
- f. placing Mr. O'Burke into an induced coma;
- g. violating the Emergency Medical Treatment and Active Labor Act (EMTALA) as further described below; and

h.  failing to properly train and supervise medical and administrative staff.

74. All of the above acts of negligence also constitute reckless conduct, and the misrepresentations and omissions described above constitute intentional fraudulent conduct.[1]

75. As a result of Defendants' breaches of the standard of care, Mr. O'Burke was injured and the O'Burke's suffered damages as described herein.

## SECOND CAUSE OF ACTION
## EMERGENCY MEDICAL TREATMENT AND ACTIVE LABOR ACT (EMTALA)
## (42 U.S.C. § 1395dd)
## (TriStar Hendersonville Only)

76. The O'Burkes incorporate the allegations set forth above as if fully described herein.

77. EMTALA requires any hospital that participates in Medicare to take certain steps when a patient presents with an emergency medical condition. As a threshold matter, the hospital must either (a) provide such further examination and treatment as may be required to stabilize the patient, or (b) provide for an appropriate transfer to a hospital that can provide a higher level of care, assuming the benefits of the services at another facility outweigh the risks of transferring a not-yet-stabilized patient.

78. In the Sixth Circuit, EMTALA applies to patients who have not been stabilized, whether or not they have been admitted as inpatients, HCA's EMTALA transfer policy acknowledges.

79. If a hospital is unable to stabilize an individual within its capability, an appropriate

---

[1] To the extent the O'Burkes' allegations of intentional fraudulent conduct must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), they are pled with sufficient particularity to put Defendants on notice of the precise nature of the fraud perpetrated on the O'Burkes. Certain information, including the identities of TriStar Hendersonville agents and employees who were not identified to the O'Burkes, is unavailable to the them because it is exclusively in Defendants' possession, custody, or control.

14

transfer should be implemented. *See* 42 CFR § 489.24(b) & (d) and related CMS interpretive guidance (available at https://go.cms.gov/2tbWD1m).

80. Under EMTALA, before transferring a patient whose emergency medical condition is not stabilized, a hospital must inform him of the hospital's obligations under the law, and it must describe the risks and benefits of transfer to another facility.

81. EMTALA, and HCA's Tennessee EMTALA transfer policy, which applies to TriStar Hendersonville, requires hospitals to give patients complete and accurate information about matters pertaining to the transfer decision, including about the medical necessity of the movement and availability of appropriate services at both the transferring and receiving hospitals.

82. EMTALA, and HCA's Tennessee EMTALA transfer policy, which applies to TriStar Hendersonville, requires a transferring hospital to document its communication with the receiving hospital, including the request date and time.

83. Receiving hospitals have a duty to report any inappropriate transfer received from a transferring institution. A hospital that suspects it may have received an improperly transferred individual is required to promptly report the incident to the Centers for Medicare & Medicaid Services ("CMS") or the state agency within 72 hours of the occurrence. Failure to report within 72 hours may result in an EMTALA violation by the receiving facility.

84. A hospital that violates EMTALA can be liable for civil penalties and, in a civil lawsuit by an injured plaintiff, damages.

85. A physician who misrepresents information relevant to an emergency medical transfer violates EMTALA, can be subject to civil monetary penalties, and—if the violation is gross and flagrant or repeated—can be disqualified from participating in Medicare and state health programs.

86. Mr. O'Burke presented at TriStar Hendersonville with an emergency medical condition.

87. TriStar Hendersonville violated EMTALA by, at minimum: failing to stabilize Mr. O'Burke or provide for an appropriate transfer; failing to provide complete and accurate information about matters pertaining to the transfer decision, including by misrepresenting the risks and benefits of transfer, the medical necessity of transfer, and the availability of appropriate services at the transferring and receiving hospitals; and failing to document all communications relating to the transfer request.

88. Dr. Noto, Dr. Patel, and/or Dr. Southwell, as well as other physicians who provided care to Mr. O'Burke at TriStar Hendersonville, violated EMTALA by failing to provide complete and accurate information about matters pertaining to the transfer decision, including by misrepresenting the risks and benefits of transfer, the medical necessity of transfer, and the availability of appropriate services at the transferring and receiving hospitals.

89. TriStar Hendersonville had one or more improper motives—reducing out-migration from the TriStar system to prevent financial losses to HCA/TriStar and wanting to appear more competent than they in fact were—when it and its agents violated EMTALA.

90. As a result of TriStar Hendersonville's violations of EMTALA described above, Mr. O'Burke was injured and the O'Burkes suffered damages as described herein.

### THIRD CAUSE OF ACTION
### FALSE IMPRISONMENT

91. The O'Burkes incorporate the allegations set forth above as if fully described herein.

92. False imprisonment is the intentional restraint or detention of a person without just cause.

93. Mr. O'Burke was detained at TriStar Hendersonville—unable to leave because he was completely sedated and immobilized, his medical decision-makers' (Mrs. O'Burke and Mr. Hieber) transfer requests were refused, and the information Defendants gave his medical decision-makers about the need for and possibility of transfer was incomplete, inaccurate, and false.

94. Mr. O'Burke's detention at TriStar Hendersonville was unlawful. It was facilitated based on false pretenses articulated by physicians and TriStar Hendersonville agents and employees who had a duty to provide truthful, accurate, and complete information, as more fully described above. In breaching these duties they violated EMTALA, the Tennessee Health Care Liability Act, committed fraud, and breached common-law duties including the duty of care.

95. To the extent Mr. O'Burke or his medical decision-makers allegedly consented to his detention at TriStar Hendersonville, that consent was obtained based on fraud, deception, and/or false pretenses.

96. As a result of Defendants' detention of Mr. O'Burke without just cause, Mr. O'Burke was injured and the O'Burkes suffered damages as described herein.

## FOURTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

97. The O'Burkes incorporate the allegations set forth above as if fully described herein.

98. Each member of a married couple in Tennessee has the right to enjoy the conjugal fellowship of married spouses, and the right to the company, cooperation, affection and aid of the other, including the services a spouse provides.

99. As a result of the above-described injuries to Mr. O'Burke caused by Defendants, Mrs. O'Burke's enjoyment of the company, cooperation, affection, aid, services, and conjugal fellowship with Mr. O'Burke has been greatly impaired.

# PRAYER FOR RELIEF

**WHEREFORE**, Mr. and Mrs. O'Burke pray for the following relief:

100. That proper process issue and be served upon the Defendants, and the Defendants be required to appear and answer this Complaint within the time required by law;

101. That the Plaintiff be awarded fair and reasonable damages, including compensatory and punitive damages, in an amount to be proven at trial;

102. That the Plaintiff be awarded the costs of trying this action;

103. That this action be heard by a jury;

104. That costs of this action be taxed to the Defendants;

105. That prejudgment interest be awarded to the Plaintiff for economic damages;

106. That the Plaintiff be awarded all and any such other and further relief as the Court deems proper; and,

107. That Plaintiff's right to amend this Complaint to conform to the evidence be reserved.

Respectfully submitted,

**John Spragens, TN Bar No. 31445**
Spragens Law PLC
1200 16th Ave. S.
Nashville, TN 37212
T: (615) 983-8900
F: (615) 682-8533

*Attorney for the Plaintiffs*